
```
USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 6/18/2020
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WILFREDO TORRES,

                Plaintiff,

       v.

BELLEVUE SOUTH ASSOCIATES L.P.;
CITY OF NEW YORK; BELLEVUE
HOSPITAL; OFFICER COLBY WRIGHT;
OFFICER NICHOLAS MACHIO; OFFICER
MICHAEL TRAVERSO; OFFICER
KRZYSZTOF FRYC; OFFICER KEVIN
WAHLIGH; NYU HOSPITALS CENTER;
DOCTOR AARON BUCKLAND; DENNIS
MCGOWAN; LIEUTENANT JAMES
SCORDUS; FIREFIGHTER DANIEL
BARVELS; FIREFIGHTER JOHN PEPE;

                Defendants.

No.   16-CV-2362 (RA)

OPINION DECLINING TO ADOPT
REPORT & RECOMMENDATION

RONNIE ABRAMS, United States District Judge:

      On March 29, 2016, Plaintiff Wilfredo Torres, proceeding *pro se*, brought this action against the New York City Police Department, the New York City Department of Buildings, and Bellevue South Associates, alleging violations of the First and Fourth Amendments pursuant to 42 U.S.C. § 1983.  Dkt. 1.  On October 24, 2016, Plaintiff filed an amended complaint, adding several defendants including the New York City Health and Hospital Corporation ("HHC"), sued herein as "Bellevue Hospital."  Dkt. 33.  The allegations against HHC stem from a wellness check conducted on Plaintiff at his apartment on April 28, 2016, which concluded with him

being transported to HHC for evaluation. On February 5, 2018, HHC moved for summary judgment.[1] Dkt. 197.

I.      **Report & Recommendation**

On February 26, 2020, Magistrate Judge Fox issued a Report and Recommendation ("Report"), recommending that the Court deny HHC's motion without prejudice as "procedurally defective" for failing to comply with Local Civil Rule 56.2. Rpt. at 3 (Dkt. 377). Local Civil Rule 56.2 provides that "[a]ny represented party moving for summary judgment against a party proceeding *pro se* shall serve and file as a separate document, together with the papers in support of the motion, the following 'Notice to Pro Se Litigant Who Opposes a Motion For Summary Judgment' with the full texts of Fed. R. Civ. P. 56 and Local Civil Rule 56.1 attached." Judge Fox explained that HHC had filed Local Civil Rule 56.2's requisite notice on ECF, *see* Dkt. 201, as well as an affidavit stating that the notice had been served on Plaintiff, *see* Dkt. 202. HHC had not, however, attached "the full text of Rule 56 of the Federal Rules of Civil Procedure nor the full text of Local Civil Rule 56.1 . . . as represented by [its counsel]." Rpt. at 3. Although Plaintiff had opposed HHC's motion, Judge Fox "lack[ed] confidence that Torres understood fully his obligations in responding to HHC's motion for summary judgment" based on his filings. *Id.* at 4. In particular, Judge Fox stated that "the motion record does not support a finding that Torres, in the absence of a proper Local Civil Rule 56.2 notice, understood that in order to avoid summary judgment he needed to submit affidavits or other evidence to demonstrate that a genuine dispute over a material fact(s) existed[.]" *Id.* at 5.

---

[1] On February 14, 2018, Magistrate Judge Fox granted in part Plaintiff's opposed request to file a second amended complaint. Dkt. 218. After that ruling, HHC asked the Court either to reject any new allegations made against it in the second amended complaint or to treat their previously filed motion for summary judgment "as a response to any allegations in the Second Amended Complaint." Dkt. 281.

2

On March 11, HHC filed objections to the Report pursuant to Federal Rule of Civil Procedure 72.  *See* HHC Obj. (Dkt. 379).  HHC acknowledges that the full texts of Rule 56 and Local Civil Rule 56.1 were not attached to the notice filed on the docket.  *See id*. at 5.  However, it asserts that "[i]t is the custom and practice of [its] office to separately compile and bind full texts of Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1[,] along with the unpublished decisions cited in its moving papers and serve on Pro Se Plaintiffs[,]" and it "has no reason to believe that [the] office did not follow this custom and practice two years ago," when this motion was filed.  *Id.*

HHC also contends that even if it did not provide Plaintiff with the full text of these rules, Plaintiff nonetheless "was aware of the requirements of the Rules" for two reasons.  *Id.*  First, the text of HHC's Local Civil Rule 56.2 notice advised Plaintiff of these requirements.  Second, HHC's co-defendants in this action – City of New York and several individual NYPD officers (collectively, the "City Defendants") – had filed their motion for summary judgment on the very same day that HHC did.  With their motion for summary judgment, the City Defendants filed a Local Civil Rule 56.2 notice to Plaintiff on ECF, which included the full texts of both Rule 56 and Local Civil Rule 56.1.  *See* Dkt. 205 (City Defendants' Local Civil Rule 56.2 notice); Dkt. 214 (City Defendants' Affidavit of Service).  As such, HHC asks the Court to decline to adopt Judge Fox's Report and to grant its motion for summary judgment on the merits.

Plaintiff filed several letters responding to the Report and HHC's objections.  Plaintiff first filed objections, which broadly addressed the five Report and Recommendations that Judge Fox issued on February 26.  *See* Dkt. 380 (docketed on Mar. 13, 2020).  As he alleged in his earlier filings, Plaintiff again claimed that he is "included in the federal government terrorism

list" and that the incident on April 28, 2016 was "part of the domestic assassinations programs."[2] *Id.* at 1. Then, specifically in response to HHC's objections, Plaintiff asked the Court to "deny [HHC's] present application," repeating his allegations that HHC "tortur[ed] [him] as a John Doe on 4-28-16 after [he] was kidnapped from [his] apartment by agents of the U.S. Central Intelligence Agency ('CIA') because [of his] erroneous inclusion in the federal terrorists list." Dkt. 382 at 1 (docketed on Mar. 26, 2020). He also argues that HHC's request for the Court "to overrule the findings of Judge Fox" was part of its "continuous attempts to manipulate this Court."[3] *Id.* at 2.

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Parties may object to a magistrate judge's recommended findings "[w]ithin 14 days after being served with a copy of the recommended disposition[.]" Fed. R. Civ. P. 72(b)(2). "The district court may adopt those portions of the report to which no specific, written objection is made, as long as the factual and legal bases supporting the findings and conclusions sets forth in those sections are not clearly erroneous or contrary to law." *Minto v. Decker*, 108 F. Supp. 3d 189, 192 (S.D.N.Y. 2015) (internal quotation marks omitted). However, a court must undertake a *de novo* review of those portions to which specific objections are made. *See* 28 U.S.C. § 636(b)(1)(C).

Because HHC filed written and specific objections to Judge Fox's recommendation to deny the motion for failing to comply with Local Civil Rule 56.2, the Court undertakes a *de novo*

---

[2] Plaintiff also contends that "Judge Fox relied on inaccurate or incomplete data, but [he] could not correct it because to file objections [he] was only give fourteen (14) days after its 2-25-20 decision" and thus "had no time to consult with the Court's legal clinic for pro se litigants." *Id.* at 2. Plaintiff, however, does not explain what he believes is the "inaccurate or incomplete data" that Judge Fox relied on in any of the Report & Recommendations, let alone the Report at issue here. *Id.* Nor did Plaintiff request an extension to file his objections.

[3] This same letter was filed on the docket on March 31, 2020. Dkt. 383. In addition, several weeks later, Plaintiff again filed identical objections, explaining that he was "submit[ing] the same petition in the form of a letter." Dkt. 384 (docketed on Apr. 20, 2020).

review of the Report. "Local Civil Rule 56.2 plays a valuable role in alerting pro se litigants to the potentially serious consequences of a motion for summary judgment, and to the requirements for opposing such a motion." Local Civ. R. 56.2, Comm. Note. As such, the Second Circuit has "remind[ed] the district courts of this circuit, as well as summary judgment movants, of the necessity that *pro se* litigants have actual notice, provided in an accessible manner, of the consequences of the *pro se* litigant's failure to comply with the requirements of Rule 56." *Irby v. N.Y.C. Transit Auth.*, 262 F.3d 412, 414 (2d Cir. 2001). "In the absence of such notice or a clear understanding by the *pro se* litigant of the consequences of failing to comply with Rule 56, vacatur of the summary judgment is virtually automatic." *Id.* Nonetheless, while "[a] defendant's failure to provide a notice under Local Civil Rule 56.2 can be grounds for denial of a motion for summary judgment, . . . it is not dispositive." *Azkour v. Haouzi*, No. 11-CV-5780 (RJS), 2017 WL 3016942, at *6 (S.D.N.Y. July 17, 2017) (internal quotation marks omitted). "Rather, when a represented party fails to provide proper notice under Local Civil Rule 56.2, the Second Circuit has instructed courts to consider 'whether from all of the circumstances, including the papers filed by the *pro se* litigant, it is reasonably apparent that the litigant understood the nature of the adversary's summary judgment motion and the consequences of not properly opposing it.'" *Id.* at *6 (quoting *Sawyer v. Am. Fed'n of Gov't Emps.*, 180 F.3d 31, 35 (2d Cir. 1999)).

As Judge Fox correctly noted, the Local Civil Rule 56.2 notice that HHC filed on the docket did not attach the full texts of Rule 56 and Local Rule 56.1. *See* Dkt. 201. HHC now represents that it assumes that it served the text of those rules on Plaintiff because that is the "custom and practice of [its] office" and it was only an "inadvertent failure to upload the Rules to ECF as attachments to the Notice." HHC Obj. at 5, 7. At this juncture, however, the Court

5

cannot rely solely on this representation to determine whether Plaintiff had actual notice or an understanding of his requirements under Rule 56.

Nevertheless, the Court agrees with HHC that even if it did not send Plaintiff the full texts of Rule 56 and Local Civil Rule 56.1, "all of the circumstances" demonstrate that Plaintiff had actual notice of his requirements. *Sawyer*, 180 F.3d at 35. First, HHC served Plaintiff with the Local Civil Rule 56.2 notice, which "explicitly sets forth" Plaintiff's requirements in opposing HHC's motion. HHC Obj. at 7. For instance, the notice states that "Rule 56 provides that you may NOT oppose summary judgment simply by relying upon the allegations in your complaint." Dkt. 201. It further explains what is required in opposing this type of motion:

> [Y]ou must submit evidence, such as witness statements or documents, countering the facts asserted by the defendant and raising specific facts that support your claim. If you have proof of your claim, now is the time to submit it. Any witness statements must be in the form of affidavits. An affidavit is a sworn statement of fact based on personal knowledge stating facts that would be admissible in evidence at trial. You may submit your own affidavit and/or the affidavits of others. You may submit affidavits that were prepared specifically in response to defendant's motion for summary judgment.

*Id.*

Second, on the same day that HHC filed its motion, so did the City Defendants. With their motion, the City Defendants served and filed a Local Civil Rule 56.2 notice, which attached the full texts of both Rule 56 and Local Civil Rule 56.1. *See* Dkt. 205. Therefore, on the same day that Plaintiff should have received the text of these rules from HHC, he certainly received the text of these rules from the City Defendants. And while another defendant's proper filing of a Local Civil Rule 56.2 notice may not always cure a co-defendant's deficient notice, it is particularly relevant here that Plaintiff received the requisite texts from the City Defendants on the exact same day that he should have received them from HHC.

In recommending that the Court deny HHC's motion for failing to comply with Local Civil Rule 56.2, the Report points to deficiencies with Plaintiff's opposition papers to explain why it "lack[ed] confidence that Torres understood fully his obligations." Rpt. at 4. It notes, for instance, that the first sentence of Torres' opposition brief incorrectly refers to the document as his "answer to defendant City of New York Motion for Summary Judgment." *Id.* at 3. According to the Report, this demonstrated that Plaintiff's opposition was "not tailored specifically to address HHC's motion for summary judgment." *Id*. The Report also cited Plaintiff's failure to "submit an affidavit(s) or memorandum of law setting forth the cases or authorities upon which he was relying in opposing HHC's motion, as required by Local Civil Rule 7.1(b) of this court," and to cite to admissible evidence in the record. *Id.* at 3-4.

But these deficiencies with Plaintiff's opposition do not appear to be the result of HHC's failure to send Plaintiff the full text of Rule 56 and Local Civil Rule 56.1. The Court has compared Plaintiff's opposition to HHC's motion, for which there is no proof that he received the full text of the rules, to his opposition to the City Defendants' motion, for which he indisputably did receive the full text of those rules. There is no difference in Plaintiff's filings – that is, neither opposition satisfied Rule 56's requirements for opposing a motion for summary judgment. Reviewing his responses to HHC's and the City Defendants' Rule 56.1 Statements, for example, Plaintiff does not provide a single citation to the record in either response. *Compare* Dkt. 230 (HHC), *with* Dkt. 233 (City Defendants). Moreover, his opposition briefs are essentially identical, asserting allegations – without any record support – that he is "a political dissident targeted by the U.S. government" and the incidents on September 28, 2015 and April 28, 2016 were "attempted assassinations against [him]." *Compare* Dkt. 232 (HHC), *with* 229 (City Defendants). The Court thus has no basis to conclude that the deficiencies in Plaintiff's

7

response to HHC's motion were a result of HHC's failure to provide the full text of Rule 56 and Local Civil Rule 56.1.

On a final note, Federal Rule of Civil Procedure 1 provides that the rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1; *see also Automatic Sys. Developers, Inc. v. Sabratek Corp.*, No. 93-CV-7149 (VLB), 1994 WL 62127, at *1 (S.D.N.Y. Feb. 15, 1994) ("Rule 1 calls upon federal courts to construe and administer all relevant rules to seek the 'just, speedy, and inexpensive' determination of every action."). As the 1993 amendment to the rule notes, Rule 1 "recognize[s] the affirmative duty of the court to exercise the authority conferred by these rules to ensure that civil litigation is resolved not only fairly, but also without undue cost or delay." Fed. R. Civ. P. 1, Advisory Comm. Notes, 1993 Amendment. In light of totality of the circumstances here, in particular that Plaintiff at the very least received Local Civil Rule 56.2 notice from HHC and the full text of Rule 56 and Local Civil Rule 56.1 from the City Defendants, it would be contrary to Rule 1's objective of ensuring "speedy[] and inexpensive determination[s]" to deny HHC's motion on this procedural ground. *Automatic Sys. Developers, Inc.*, 1994 WL 62127, at *1.

Accordingly, after undertaking a *de novo* review of the Report, the Court concludes that Plaintiff had adequate notice and understanding of his requirements under Rule 56 and declines to adopt the Report's recommendation to deny HHC's motion on this procedural ground.

## II.     HHC's Motion for Summary Judgment

Because the Court declines to adopt the Report's recommendation, the Court now turns to reviewing the merits of HHC's motion.

A.  Facts[4]

Plaintiff brings this action regarding alleged conduct resulting from two separate incidents on September 28, 2015 and April 28, 2016.  Because HHC was not involved in the first incident, the following facts pertain only to the April 28, 2016 incident.

On April 26, 2016, Plaintiff underwent spinal surgery at NYU Hospitals Center ("NYU Hospital").[5]  Def.'s 56.1 Stmt. ¶ 7.  Dr. Aaron Buckland performed Plaintiff's surgery.  During the surgery, a surgical drain was placed in Plaintiff's back.  Dkt. 199, Ex. D at 2 (NYU Hospital Medical Records).  Plaintiff was told that "[t]he drain should stay in place for a number of days after the surgery," he could not remove it himself, and a doctor would remove it during a scheduled appointment after the surgery.  Dkt. 199, Ex. C at 86:7-20 (Transcript of Plaintiff's Deposition).  Plaintiff was also told that he would be discharged from the hospital on April 29.  *See id*. at Tr. 84:7-10; Pl.'s Opp. at 3 (Dkt. 232) ("After undergoing the surgery I was scheduled to be released on 4-29-16.").

On April 28, a day prior to his scheduled discharge, Plaintiff discharged himself against the advice of NYU Hospital's medical staff.  *See* Def.'s Rule 56.1 Stmt. ¶ 8.  Hospital records from that morning describe Plaintiff as "agitated," "display[ing] paranoid behaviors, stating that people were 'tampering with the food,'" and "continu[ing] to refuse all interventions[.]"  Dkt.

---

[4] The following facts are drawn from HHC's Rule 56.1 Statement and the exhibits filed with its summary judgment motion.  Unless otherwise noted, the facts are uncontroverted.  Plaintiff has not provided a substantive response to HHC's Rule 56.1 Statement, instead stating only whether he believes HHC's factual assertions are true or false or that he does not know.  His responses do not include any citations to the record, nor does he explain why he believes some of HHC's factual assertions to be false.
   "[W]here a *pro se* plaintiff fails to submit a proper Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions."  *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009).  Accordingly, the Court will "conduct[] an independent review of all of the evidence submitted . . . , so as to ascertain whether the record actually reveals any material, disputed issues of fact."  *Id.*  Therefore, only where HHC's "Rule 56.1 statement is not contradicted by the court's review of the record" will its "assertions be . . . admitted as a matter of law."  *Toliver v. Office-Dep't of Corrs. N.Y.C. et al.*, No. 10-CV-5354 (DAB), 2013 WL 3783727, at *2 n.1 (S.D.N.Y. July 9, 2013) (internal quotation marks omitted).

[5] Also a defendant in this action, NYU Hospital was sued herein as "NYU Hospital for Joint Diseases."

9

199, Ex. D at 1-2. It appears that Plaintiff decided to discharge himself because he did not like the breakfast provided that morning. *See id.* (explaining that Plaintiff "stat[ed] he's going to leave 'to get some real breakfast'" and that "this isn't a breakfast you would serve to a person"); *see* Dkt. 199, Ex. E at 11 (HHC Medical Records) ("When asked why he left [the] hospital of joint disease patient states that he was not happy with the food."). Although the medical staff attempted "to rectify this situation without him leaving, explaining that he still had his drain in and had not been cleared by his surgeon for discharge," Plaintiff was "not receptive" and refused "attempt[s] to assess [his] mental status," including declining to speak to Dr. Buckland over the phone. Dkt. 199, Ex. D at 2. Therefore, despite NYU Hospital's attempts to stop him, Plaintiff left the hospital with the surgical drain in his back on April 28.[6]

Concerned with Plaintiff's decision to discharge himself, NYU Hospital called the New York City Fire Department ("FDNY") to ask them to perform a wellness check. *See* Dkt. 199, Ex. E at 8 (FDNY Prehospital Care Report Summary). FDNY and NYPD officers went to Plaintiff's apartment, as well as Dr. Buckland who sought to check on Plaintiff's wellbeing. Plaintiff did not respond to their attempts to speak with him and refused to open his apartment door, leading the FDNY officers to break it down. Once Dr. Buckland and the officers were inside his apartment, Plaintiff "remained combative." *Id.* For instance, medical records establish that Plaintiff did not allow Dr. Buckland to remove the surgical drain or anyone to perform a physical assessment of him. *See* Dkt. 199, Ex. E at 95 ("Pt called them terrorists, wouldn't answer clinical questions and refused to be examined by the MDs."). Dr. Buckland then noticed

---

[6] In his opposition brief, Plaintiff asserts that "while [he] was recovering from the surgery the FBI-NYPD Terrorist Task Force created at NYU an atmosphere of hostility and harassment against [him] from some employees," indirectly suggesting that this was the reason that he discharged himself. Pl.'s Opp. at 3. Plaintiff, however, provides no support for this assertion, and in the very next paragraph also mentions that he "informed the administrators that [he] wanted to return home that day rather than the following day as scheduled" after being "served two scrambled eggs and a box of raisins a[t] breakfast." *Id.*

10

that the surgical drain was removed, but Plaintiff "would not give details on how he removed his drain." Dkt. 199, Ex. E at 11; *see also* Dkt. 199, Ex. C. at 104:4-6 (explaining how he removed the drain at his apartment). In light of Plaintiff's condition and refusal to permit anyone to evaluate him, Dr. Buckland decided to commit him. Plaintiff was thus transported to HHC's emergency department. *See* Dkt. 199, Ex. E at 8, 11 ("The patient was brought in . . . for further eval of his delirium.").

Upon arriving at HHC's emergency department around 4:00 p.m., "[Plaintiff] refused to provide his name, date of birth, or medical history" or to sign consent forms.[7] Def.'s 56.1 Stmt. ¶ 11; *see also* Dkt. 199, Ex. E at 18-20 (unsigned HHC consent forms). Plaintiff explains that he refused to give this information or consent to any medical treatment because "[he] was there involuntarily and [he] wasn't supposed to be there. That [he] had been kidnapped from [his] house and that [he] will not consent to any medical treatment or examination." Dkt. 199, Ex. C at Tr. 24:10-14; *see also* Dkt. 199, Ex. E at 97 ("Pt also unwilling to provide collateral contact information which would be helpful in assessing baseline mental status."). HHC's medical staff noted Plaintiff's condition upon his entry to the emergency department as follows:

> Pt presents to aes with acute change in mental status s/p spinal surgery. Pt eloped from Joint disease after surgery. Pt. uncooperative and refusing to give information on arrival. Refuses to give name. Surgical site clean and dry. Placed on 1:1 observation for elopement Alert and oriented X3[.]

Dkt. 199, Ex. E at 33; *see also id.* at 35 (explaining that Plaintiff "became acutely delirious and eloped from the hospital with drains still in place").

Dr. Aaron Hultgreen, the physician who attended to Plaintiff in HHC's emergency department, explains that "[b]ased on the medical history provided to [him], Mr. Torres had

---

[7] During his deposition, Plaintiff stated that he did not believe anyone had asked him for his name while he was at HHC and that he did not give his name because he "assumed that they knew who [he] was." Dkt. 199, Ex. C at Tr. 20:13-20.

11

become acutely delirious and eloped from [NYU Hospital] post spinal lumbar fusion, and needed to be assessed for altered mental status and evaluation of a surgical drain in his back." Dkt. 199, Ex. F at ¶ 4 (Decl. of Dr. Hultgreen). According to Dr. Hultgreen, "Emergency Medicine standard of care required that Mr. Torres be assessed for postsurgical complications including but not limited to delirium and infection and his capacity to make medical decisions." *Id.* at ¶ 5. "It would have been a departure from the standard of care," Dr. Hultgreen states, "to have discharged Mr. Torres without performing an evaluation of his postsurgical condition as he did not demonstrate the capacity to refuse treatment nor leave against medical advice[.]" *Id.* As such, Dr. Hultgreen "ordered blood work, chest x-ray, EKG, urinalysis and heat CT scan," as well as "sedation if [Plaintiff] did not cooperate with the workup" and "one to one observation."[8] *Id.* at ¶ 7. Because Plaintiff "had pulled the drain out himself," he also "ordered an x-ray of the lumbar spine to rule out a retained pulled drain[.]" *Id.* at ¶ 8; *see also* Dkt. 199, Ex. G at ¶ 7 (Decl. of Dr. Su) ("There was a serious concern that Mr. Torres may have had a retained foreign body stemming from the surgical drain and/or delirium, a very dangerous medical condition with a high mortality rate."). The plan was to hold Plaintiff overnight for "observ[ation]" and to "rule out causes" of delirium, and release him the next morning so long as he is "able to explain circumstances under which he would come back to the hospital (infection, bleeding, etc[.])." Dkt. 199, Ex. E at 43; *see also* Dkt. 199, Ex. F at ¶ 15 (explaining that Plaintiff "needed further

---

[8] Because a CT scan "cannot be performed without a patient's cooperation, [Plaintiff] was sedated with the medication Haldol before the scan was conducted." Def.'s 56.1 Stmt. ¶ 13. Plaintiff was later given additional sedatives to ensure cooperation during the test. *See* Dkt. 199, Ex. E at 40-41; *see also* Dkt. 199, Ex. G at ¶ 7 ("It was appropriate for Mr. Torres to be evaluated and an administration of Haldol/Ativan in order to effectuate administration of urgent tests/evaluations to rule out delirium and a retained foreign body was proper."). The medical staff required the assistance of hospital security to administer this medication. *See* Dkt. 199, Ex. F at ¶ 11; Def.'s 56.1 Stmt. ¶ 14 (explaining that "hospital police assist[ance] . . . in administering medication . . . [is] in accordance with accepted standards of medical practice in the emergency department"). Plaintiff alleges that a "security guard grabbed [him] by the neck and threw [him] on the floor." Dkt. 199, Ex. C at Tr. 32:11-17. There is no evidence, however, of this in the record. And as Dr. Hultgreen explains, "[i]f [Plaintiff] had been thrown to the ground or subject to an otherwise similar physical encounter, it would have been documented in the medical chart per custom and practice in the ED." Dkt. 199, Ex. F at ¶ 11.

12

monitoring and evaluation for potential infectious and medical causes for his delirium that could lead to a threat to his life").

In addition to these tests, Dr. Hultgreen ordered a psychiatric consultation of Plaintiff, which was performed by Dr. Jenny Ching-Ya Su and Dr. Kristel Carrington. Dr. Su and Dr. Carrington concluded that "[t]hough pt was alert and oriented, he has several medical reasons for potential delirium including recent surgery and anesthesia and acute pain." Dkt. 199, Ex. E at 97. They also determined that he lacked the "capacity to refuse medical evaluation" or to "leave," and is "an acute risk to self given his poor insight into his medical status and unwillingness to cooperate with medical evaluation." Id. In sum, the psychiatric evaluation provided that "[a]lthough Mr. Torres was able to verbalize his choice to leave the hospital, he was unable to provide a reasoned explanation as to why he wanted to leave and did not demonstrate an awareness or appreciation of the risks associated with leaving the hospital without treatment (infection, bleeding, retained foreign body, etc.)," and thus "recommended continued medical evaluation to assess potential causes for the delirium." Dkt. 199, Ex. G at ¶¶ 4-5.

That evening, Plaintiff's CT scan reflected "no acute infract, midline shift or hemorrhage," and the "x-ray of the lumbar spine . . . showed no evidence of a retained drain catheter." Def.'s 56.1 Stmt. ¶ 17. Around 9:30 p.m., Dr. Perry Evangelista, an orthopedic resident, along with Dr. Toni McLaurin, an orthopedic attendant, conducted a consult and concluded that Plaintiff "had removed the surgical drain himself and was suffering from acute delirium." Def.'s 56.1 Stmt. at ¶ 18. They also noted that Plaintiff "suffered no injury when the hospital police assisted in the administration of the sedative." Id.

The next morning around 11:00 a.m., Plaintiff met with Dr. Gabriel Katz, a psychiatrist, who determined that Plaintiff was no longer in a delirious state and authorized his discharge from HHC. *See* Dkt. 199, Ex. H at ¶ 3 (Decl. of Dr. Hwang). In contrast to his condition the night prior, Plaintiff was now willing to "sp[eak] and describe[] the events that led to his hospitalization" and "expressly advised that he would follow up for treatment[.]" *Id.* Dr. John Hwang, the attending doctor that morning, explained that he approved of Plaintiff's discharge because Plaintiff "was responding appropriately to questions," "did not appear to be a threat to others," and "verbalized and understood the risks of leaving the hospital." *Id.* ¶ 5; *see also* Dkt. 199, Ex. E at 11 ("Patient was reevaluated by psychiatry and determined that patient is not delirious and had capacity to make medical decisions[.]"). Plaintiff was, therefore, discharged from HHC on the morning of April 29.[9]

### B. Legal Standard

Federal Rule of Civil Procedure 56 authorizes a court to grant summary judgment if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). "A fact is material if it 'might affect the outcome of the suit under the governing law,'" and it is genuinely in dispute if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In deciding such a motion, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011). "[I]t is well established that a court is ordinarily obligated to afford a special solicitude to *pro*

---

[9] Although Dr. Hwang observed that Plaintiff had a fever that morning, he determined that "further medical hospitalization purely to observe a postop fever is not likely to benefit this patient." Dkt. 199, Ex. E at 62.

14

se litigants, particularly where motions for summary judgment are concerned." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016) (per curiam) (internal citations and quotation marks omitted). Thus, "[c]ourts read the pleadings, briefs, and opposition papers of pro se litigants 'liberally and interpret them to raise the strongest arguments that they suggest.'" *Rivera v. Goulart*, No. 15-CV-2197 (VSB), 2018 WL 4609106, at *2 (S.D.N.Y. Sept. 25, 2018).

### C. Application

Plaintiff has not clearly stated the basis for his claims against HHC.  However, HHC assumes – as does the Court – that "Plaintiff is bringing 42 U.S.C. § 1983 claims based on alleged violations of the Fourth and Fourteenth Amendments," in addition to state law claims. Def.'s Mot. at 2 (italics omitted).

#### 1. Section 1983 Claims

HHC first contends that Plaintiff's § 1983 claims fail because HHC "is subject to the laws governing municipal liability," and Plaintiff has not identified a policy or custom that caused his alleged injuries.  *Id*.  "Wholly apart from a failure of proof regarding an unconstitutional [HHC] policy," HHC also argues that his claims fail because "there is no basis to conclude that employees of [HHC] violated Plaintiff's Fourth or Fourteenth Amendment rights."  *Id.* (italics omitted).

HHC is "a public benefit corporation."  *Id.*; *see also Simpkins v. Bellevue Hosp.*, 832 F. Supp. 69, 73 (S.D.N.Y. 1993) ("The New York City Health and Hospitals Corporation is a public benefit corporation created to provide health and medical services to New York City residents pursuant to the New York City Health and Hospitals Corporation Act[.]"); *Mejia v. N.Y.C. Health & Hosp. Corp*, No. 16-V-9706 (GHW), 2018 WL 3442977, at *5 (S.D.N.Y. July 17, 2018) (referring to HHC "[a]s a municipal corporation").  Accordingly, § 1983 claims

15

brought against HHC require the same analysis under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), as claims brought against a municipal entity. *See Simpkins*, 832 F. Supp. at 73 ("As a municipal corporation, NYCHHC's liability under § 1983 is governed by the principles set forth in *Monell v. Department of Social Services* and its progeny."). Therefore, for HHC to be liable here, Plaintiff "must prove that the constitutional wrong complained of resulted from the corporation's official policy, custom, ordinance, regulation, or decision." *Rookard v. Health & Hosp. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law," as well as, "[i]n limited circumstances, . . . a decision not to train certain employees about their legal duty." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Plaintiff's complaint does not identify any custom, policy, or practice connected to his time and treatment at HHC or, more specifically, to the injuries he allegedly suffered while at HHC. Nor has Plaintiff pointed to any evidence in the record that creates a genuine dispute of fact as to whether HHC had a custom, policy, or practice that contributed to the alleged Fourth and Fourteenth Amendment violations. Notably, in his opposition brief, Plaintiff makes no reference to a custom, policy, or practice. Instead, he alleges that he was "kidnapped" and taken to HHC where he was "assaulted by HHC personnel." Pl.'s Opp. at 4.

What Plaintiff has alleged is thus at most a single incident consisting of especially unique circumstances. The record establishes that Plaintiff discharged himself from NYU Hospital on April 28, 2016 without medical approval and with a surgical drain in his back. According to FDNY records, Plaintiff was combative and agitated when Dr. Buckland and FDNY and NYPD officers attempted to conduct a wellness check at his home. In light of his mental state and the

16

potential risk of infection after he removed the surgical drain, he was transported to HHC, where the medical staff concluded that he was suffering from delirium, which could be a result of his spinal surgery. After conducting several tests and ensuring that Plaintiff was no longer delirious, he was released from HHC in less than 24 hours. Affidavits from Dr. Hultgreen, Dr. Su, and Dr. Hwang reflect that HHC's decision to hold Plaintiff for further evaluation that night was based on these unique circumstances and medical tests were ordered based on Plaintiff's physical and mental condition – not any custom, policy, or practice.

Moreover, it is well established that "in the absence of other evidence, mere proof of a single incident of errant behavior is an insufficient basis for finding that a municipal policy caused plaintiff's injury." *Sarus v. Rotundo*, 831 F.2d 397, 402-03 (2d Cir. 1987); *see also DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) ("[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy."). In addition, while Plaintiff has nowhere asserted that his alleged injuries were the result of one doctor's malfeasance, that still would likely be insufficient here because "a municipal corporation cannot be held liable under § 1983 on a *respondeat superior* theory." *Rookard*, 710 F.2d at 45. That is, "proof that the corporation employed a tortfeasor will not, standing alone, establish liability." *Id.*; *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986) (explaining that § 1983 was intended "to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible").

...
...
...

Because there is no evidence in the record to suggest that HHC had a practice, policy, or custom at all connected to the alleged constitutional violations that Plaintiff suffered while being evaluated and treated at HHC, Plaintiff's § 1983 claims against HHC must be dismissed.[10]

### 2. State Law Claims

Plaintiff also alleges "[p]endent state law claims" against HHC. Dkt. 275 (Second Amended Complaint). Federal district courts have supplemental jurisdiction over non-federal law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A district court, however, "may decline to exercise supplemental jurisdiction over a claim" once it "has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003). Generally, "if a plaintiff's federal claims are dismissed before trial, the state claims should be dismissed as well." *Brzak v. United Nations*, 597 F.3d 107, 113-14 (2d Cir. 2010) (citation omitted).

Here, declining jurisdiction over Plaintiff's state law claims would not disserve the principles of judicial economy, convenience, or fairness. The Court has determined that Defendants are entitled to summary judgment on all of the federal claims. Although the Court has analyzed Plaintiff's federal claims, it "has not yet invested the resources necessary to resolve

---

[10] Because the Court concludes that Plaintiff has not established HHC's liability under *Monell*, it does not address HHC's alternative argument that "[s]ummary judgment is warranted for the additional reason" that Plaintiff has not "offer[ed] evidence establishing that municipal employees violated his . . . constitutional rights." Def.'s Mot. at 7.

the [state law] claims, which require application of a different standard with which the state courts are more familiar." *Vuona v. Merrill Lynch & Co., Inc.*, 919 F. Supp. 2d 359, 394 (S.D.N.Y. 2013).  And while some discovery has taken place in this action, that work is equally applicable in state court.  *See id.*  Accordingly, the Court declines jurisdiction over Plaintiff's state claims.

## CONCLUSION

After undertaking a *de novo* review, the Court declines to adopt the Report's recommendation to deny HHC's motion without prejudice for failing to comply with Local Civil Rule 56.2.  The Court thus reviews HHC's motion for summary judgment and, for the reasons explained above, grants the motion.  The Clerk of Court is respectfully directed to terminate the motion pending at docket entry 197 and to close this case as to Defendant HHC, sued herein as "Bellevue Hospital."

SO ORDERED.

Dated:   June 18, 2020
         New York, New York

_____
Ronnie Abrams
United States District Judge